**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DOROTHY L. BUCHHAGEN       *
                              *
                              *
        v.                       *       Civil No. – JFM-12-2470
                              *
ICF INTERNATIONAL, INC.       *
                          ******

**MEMORANDUM**

        Plaintiff has filed this action alleging that she was discriminated against because of her

age in violation of the Age Discrimination in Employment Act.  She asserts claims for being

subjected to a hostile work environment, for wrongful termination of her employment, and for

retaliation.  Defendants have filed motions to dismiss.  The motions will be granted.

I.

        The facts as alleged by plaintiff, are, of course, assumed to be true for the purpose of

ruling upon defendant's motion to dismiss.  They are as follows:

        On December 18, 2002, plaintiff began work as a Technical Editor/Writer Senior at

Lockheed-Martin Corporation ("LM") on its Cancer Information Analysis and Tracking

("CIAT") contract with the Office of Cancer Content Management ("OCCM") at the National

Cancer Institute ("NCI"), National Institute of Health.  At the time she was hired, plaintiff was

64 years old.  She was hired by Deborah Beebe, PhD., who had been hired as LM's project

manager for the OCCM contract.  Plaintiff's initial principal responsibility was to research and

write content for the Dictionary of Cancer Terms.  She was under the supervision of Beebe but

she worked on a day-to-day basis with three other persons, including Robin Harrison, who was

the Glossary Coordinator.  Ms. Harrison was then in her early twenties.  In 2002 plaintiff began to get the impression that Harrison was taking and receiving credit for plaintiff's work.

In July 2007, Beebe promoted Harrison to Glossary Manager, though her official title remained Glossary Coordinator.  Beebe put Harrison in charge of Multimedia, on which plaintiff was then working in addition to her other duties.

On October 14, 2007, Beebe gave plaintiff an overall assessment of "High Contributor" (the second highest rating available) on her 2007 appraisal.  However, on or about December 4, 2007, Beebe revised the rating downward to "Successful Contributor" (a medium assessment).  Beebe told plaintiff that she had to lower her rating because LM had limited the number of people who could be put into each category due to financial constraints.

On or about March 18, 2008, plaintiff presented the results of her review of the Glossary.  Margaret Beckwith, PhD., the program officer at OCCM, was very impressed with plaintiff's presentation.  In the spring of 2008, Harrison began to attend graduate school.  Plaintiff took over most of the Glossary and Multimedia responsibilities.  During the next three years plaintiff's responsibilities increased beyond Glossary and Multimedia.  She also received pay raises and awards.  On April 14, 2008, she received a five percent pay raise.  She also received two Spot Awards and a Special Recognition Award.

On or about December 4, 2008, Harrison rated plaintiff on her 2008 Performance Evaluation as a "High Contributor."  On or about the same date LM promoted plaintiff to Technical Writer/Writer Staff, which was the equivalent to an Associate Manager position, with a 5.73% pay raise, effective February 23, 2009.  Plaintiff received another Spot Award on or about June 22, 2009.

Plaintiff asked Beebe how she could participate in various programs concerning the development of employees' careers and mentoring program throughout 2007 to 2009. Although Beebe agreed to help plaintiff, she never followed through with her promise and never offered plaintiff any management training courses. In contrast, during the same period Beebe mentored three employees who were in their twenties, including Harrison, and sent Harrison (and perhaps others) to LM management training courses.

In June 2009, NCI awarded the CIAT contract to defendant ICFZ-Tech, Inc., ("ICF") a division of defendant ICF. Individual LM employees were advised that they had to apply for their old position when the contract moved to ICF, International. In a meeting with ICF Vice President Matt Perry, when Mr. Perry asked her if she had any concerns or requests, plaintiff made two requests: (1) to have a printer in her office, and (2) not to be under Harrison's supervision. Plaintiff indicated that she did not think it was fair for her to be "supervised" by someone so young who did not have much work experience. During the latter part of the summer of 2009, Beebe and plaintiff had several discussions regarding the move of the contract from LM to ICF. In one discussion Beebe said to plaintiff, "No one will hire you at your age."

In July 2009, Beebe told plaintiff (apparently before the conversation in which Beebe referred to her age) that plaintiff most likely would become Manager of both the Glossary and Multimedia and that she would be the only person working on those projects. On or about August 11, 2009, plaintiff applied for employment with ICF as Senior Subject Matter Expert, Senior Editor/Writer on the CIT contract. On August 24, 2009, Beebe, Harrison, and plaintiff reviewed Glossary and Multimedia tasks in preparing plaintiff to take over as manager of both sections. It became apparent that plaintiff was handling most aspects of both the Glossary and

Multimedia tasks.  Plaintiff also analyzed the Glossary work that she had done when she worked at LM and found that she had written approximately 97% of glossary definitions.

By a letter dated September 18, 2009, defendant offered plaintiff a position as "Glossary Manager/Senior Associate" at its Rockville office.  The letter stated that plaintiff would report directly to Beebe.  Plaintiff spoke with Beebe about the offer letter's proposed salary and requested a raise.  Beebe requested plaintiff propose a figure.  Plaintiff proposed $60 per hour.  Beebe agreed that it was reasonable and said that she would work on it.  The $60 per hour was a substantial increase because plaintiff had been offered $39.12 an hour.  After plaintiff proposed the raise in her counteroffer to the offer of employment, the counteroffer was accepted by ICF.

Harrison did not move to ICF with her LM co-workers.  Instead, she accepted an offer from NCI for the position of Genetics Board Manager.

On October 8, 2009, during a Multimedia conference, plaintiff attempted to insert a Spanish image into a media document in the Central Date Repository.  What plaintiff refers to as a "glitch" occurred with the software program.  A slight delay ensued.  On October 9, 2009, Harrison sent Beebe an email in which, according to plaintiff, "she incorrectly blamed Plaintiff for the delay."

On October 10, 2009, Beebe complained to plaintiff that she made a mistake in not publishing the media image on October 9.  During the meeting Beebe got progressively angrier and yelled at plaintiff.  Thereafter, Beebe created what plaintiff describes as a "hostile work environment" for plaintiff because of plaintiff's age and, subsequently, for plaintiff's opposition

to the discrimination she experienced.[1]  On occasions thereafter, Beebe "repeatedly harped" on the October 8 incident as an alleged error by plaintiff.

Plaintiff continued to perform her duties very well throughout the rest of her employment by defendants.  However, Beebe harassed her, without good cause, about her work activities, e.g., her leave and whom she could talk with.  On March 17, 2010, Beebe gave plaintiff a rating of only 3.2/4.0, which was "Low Proficient," on her evaluation.  Plaintiff asked Beebe who had actually rated her, and Beebe said she did not know but implied that Perry had done the ratings. During the conversation about the evaluation, Beebe brought up the "glitch" that had occurred on October 9, 2009, even though plaintiff continued to explain that the "glitch" was not her fault. During the meeting Beebe allegedly was effusive about plaintiff's contributions.  However, three days later, at a meeting on October 12, 2009, Beebe told plaintiff that she would not be receiving any increases in her salary and that plaintiff had to copy Harrison on all of her work.  Beebe then said that, "Now you are getting credit for all of the work," referring to plaintiff's earlier complaint that Harrison had stolen credit from her.  Beebe gave higher ratings to other employees, and several members of the CIAT staff were given Spot Awards.  During an all-staff meeting held on March 19, 2010, Beebe announced that another member of the staff would be heading up the Drug Information Summaries group, and this was the first time that plaintiff learned that she would no longer be involved in that project.

On March 23, 2010, plaintiff asked Tom Carney, the Chief Operating Officer, who had actually assigned the ratings on her performance appraisal.  Carney indicated that Beebe had assigned the ratings and that if an employee had limited or no oversight from Beebe, the evaluation should be based on communications with the client.  Subsequently, Laurie O'Neal, a

---

[1] Of course, conclusory averments of discrimination are insufficient.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The facts which plaintiff contends support the averments are set forth in the opinion.

Human Resources employee, confirmed that Beebe had assigned the ratings and she indicated to plaintiff that the Performance Evaluation process was flawed and was being revamped.  Plaintiff told Ms. O'Neal about the October 12, 2009 meeting, at which plaintiff asserts Beebe had yelled at plaintiff, and plaintiff suggested to O'Neal about the employees' poor morale since defendants had taken over the contract from OCCM.  O'Neal called plaintiff a "trouble maker" for trying to get information about the Performance Evaluation process.  On March 26, 2010, plaintiff met with Perry and asked him to explain the Performance Evaluation process.  He also indicated the process was flawed and was being revised.  Plaintiff informed Perry about her history of harassment by Beebe, including Beebe's anger at plaintiff's obtaining a larger salary, Beebe's insistence on including Harrison on correspondence, her snide comments to plaintiff, including the remark about plaintiff now getting full credit for her work, Beebe's false statements to employees, Beebe's pitting employees against each other, Beebe's playing favorites, including with younger employees on the contract, Beebe's yelling at plaintiff during the October 12 meeting, and Beebe's creating a hostile work environment for her.  On March 31, 2010, Perry told plaintiff that her rating would not be reviewed.  Thereafter, plaintiff sent Perry a rebuttal to her Performance Evaluation, sending a copy to Carney.

On April 19, 2010, plaintiff expressed her concerns to Beebe about the Performance Evaluation process and the rating that Beebe had given to her.  Beebe asserted that because Harrison now worked at NCI, she was now the client and that Harrison had wanted the media documents published on October 9, 2009.  Plaintiff took (and takes) the position that it was not up to Harrison to decide when to publish the media documents, but that was the responsibility of Beckwith, Harrison's superior.  After plaintiff had informed Beckwith that the documents could not be published until the following week because the summaries people would not be able to

complete their work that day, Beckwith had not objected or criticized plaintiff.  Again, Beebe

became progressively angry during the meeting and pounded her desk. The following day

another employee stopped plaintiff and offered to be a witness for plaintiff if plaintiff needed a

witness because the employee had heard Beebe's yelling and pounding during the meeting.

Plaintiff met with O'Neal and described Beebe's unprofessional and intimidating

behavior.  O'Neal responded that plaintiff's account of the events was different from Beebe's.

O'Neal then set up a series of meetings between Beebe and plaintiff.  At the first meeting Beebe

started by saying that it was "difficult for Dottie, who is a professional, not to get the highest

rating."  Beebe admitted that she had provided plaintiff's rating but that because of the October

9, 2009 computer "glitch," she would have been justified in giving plaintiff an even lower rating.

Although Beebe expressed concerns herself about the evaluation process, she stated that she

objected to plaintiff's going to Perry and O'Neal to ask about the performance process.  Beebe

also indicated that plaintiff had some resentment towards Harrison.  Beebe denied yelling or

pounding her desk at the April 19, 2010 meeting.  Plaintiff stated that she would be able to work

with Beebe and that they could move on but Beebe said, "I don't think it will work out between

us."

On May 5, 2010, plaintiff provided documents to O'Neal to show that she deserved a

better evaluation.  O'Neal asked plaintiff if she could move past the October 9, 2009 issue, and

plaintiff indicated that she could.

On May 12, 2010, O'Neal started a meeting between plaintiff and Beebe by asking

plaintiff to name one thing that she would like to change about Beebe.  Plaintiff replied that

Beebe should not yell and that Beebe should be professional.  Later in the meeting, Beebe

indicated that plaintiff should go to Harrison about any problems with certain work and plaintiff

responded that Beckwith had told her to run the problems by her.  Plaintiff pointed out that Harrison was not involved in the Glossary, that Beckwith, not Harrison, was her supervisor, and that if Beckwith wanted Harrison involved, Beckwith would let them know.  Beebe insisted that plaintiff come to her with any questions or problems, and Beebe stated that she would be monitoring plaintiff's interactions with others on the contract and with the client.

On May 13, 2010, Beebe wrote an email to Beckwith asking how plaintiff was doing on the Glossary and insinuating that plaintiff was taking on too much work and suggested that other employees be trained as her back-ups.  Beckwith said, in response, that she believed that "Dottie is doing a great job on the Glossary and Multimedia, and I think it is fine for Robin [Harrison] and me to be consultants if necessary."

At a third meeting between O'Neal, plaintiff, and Beebe, Beebe falsely claimed that two representatives for the client had called her with concerns about plaintiff.  Plaintiff responded that the only concern that Beckwith had expressed was that the workload of having both Glossary and Multimedia might be too much for plaintiff.  Beebe and O'Neal gave plaintiff a Performance Improvement Plan.  The document included a plan for plaintiff to train two persons, who were two of three back-ups assigned to plaintiff.  The document also indicated that plaintiff was to copy Beebe and the back-ups on all her emails with client.  Plaintiff pointed out that she already had back-ups, and she questioned why her back-ups were being changed.

Although younger employees on the CIT contract had performance problems, none of them were given Performance Improvement Plans.

On June 3, 2010, plaintiff wrote an email to Beebe, copying O'Neal, questioning the Performance Improvement Plan as disparate treatment.  Beebe did not respond to the email.

8

O'Neal did respond but she did not answer plaintiff's questions and instead instructed her to follow Beebe's instructions.

On the same day plaintiff sent Beckwith an email about Glossary matters, copying Beebe and her three back-ups.  In the email plaintiff explained that she was sending the copies pursuant to a new policy that Beebe had just set in place to address concerns about the Glossary and Multimedia that Beebe said Beckwith and another representative of the client had expressed to her.  In response Beckwith said, "I don't have any concerns about the glossary or multimedia.  I just told Debbie that I think it is a good policy to have back-up for all tasks on the contract."  On June 4, 2010, plaintiff sent another email to Beckwith, and Beckwith responded by stating that she "[did not] see a need for [plaintiff], to copy everyone on the Glossary-related mail."  Plaintiff forwarded Beckwith's email to Beebe, copying O'Neal and Perry, and she asked, "How do you want me to proceed?"  O'Neal responded by stating, "As I stated in my email to you yesterday, **please follow Debbie's instructions.**  She is your manager.  Bringing this matter to the client's attention was very inappropriate.  We have discussed this very clearly in our meetings – the need to present a <u>united</u>, <u>positive</u> face to the client."

In June 2010, Beebe set up a meeting on "Glossary and Multimedia Tasks and Back-up" in her office.  Plaintiff asked Beebe to hold the meeting in a conference room because plaintiff experienced flash backs to the April 19, 2010 meeting whenever she went near Beebe's office.  Beebe did not respond to the email request.  Plaintiff also sent an email to O'Neal asking her to attend the meeting and saying that she did not want to attend the meeting in Beebe's office.  In her email to O'Neal, plaintiff defended herself against the Performance Improvement Plan and Beebe's accusations and alluded to Beebe's disparate treatment of her.  The meeting was subsequently held in Beebe's office.  Plaintiff attended the meeting by teleconference.  Beebe

began the meeting by saying that she was directed by the client to establish back-ups and was assigning Barnstead, Jamison, and Suryavnshi to serve as plaintiff's back-ups on various tasks. Plaintiff asserts that this was a false statement in light of Beckwith's June 3 email and that Beebe was moving responsibilities away from plaintiff to her younger colleagues.

On June 15, 2010, Beebe sent an email to the CIAT staff and the client, announcing that a back-up plan was in place for plaintiff. Plaintiff asserts that in the four years that she had been working on the CIT contract, no similar announcements of back-ups for other CIT employees had been made. One of the recipients of the email came to plaintiff and expressed concern that plaintiff was ill or that something bad had happened or was going to happen to plaintiff.

On June 16, 2010, plaintiff wrote an email to O'Neal, complaining about the fact that a major announcement had been made to the client and her colleagues about the back-up plan, complaining that she had been placed under a Performance Improvement Plan, and saying that Beebe should be put under a Performance Improvement Plan. In response O'Neal informed plaintiff that she was "not currently on a PIP." O'Neal also indicated that the day before she had talked with the witness to Beebe's April 19 tirade against plaintiff in her office.

On June 18 plaintiff sent an email filing a complaint of "harassment" against Beebe. Six days later there was a meeting between plaintiff, Perry, O'Neal, Shelley Strickland (ICF's Director of Human Resources) and Beebe. Beebe reiterated events that occurred during the previous eight months, beginning with the computer "glitch," plaintiff alleges that "Beebe also continued to obsess about involving Ms. Harrison in Plaintiff's work even though Ms. Harrison was now an NCI employee . . . ." Beebe also brought up a brief conversation plaintiff had had with another employee a few days earlier regarding email policy. According to Beebe, this was

an example of plaintiff's extreme "insubordination."  At the end of the meeting Beebe gave

plaintiff a "Notice of Unacceptable Behavior."

In a second meeting held that day between O'Neal, Strickland, and plaintiff, O'Neal

indicated that no one else on the CIAT staff had a problem with Beebe, that plaintiff was the

problem, and that plaintiff was a very negative, hostile, and antagonistic person who was trying

to turn people on the CIAT contract against Beebe and the client.  When plaintiff told Strickland

that she was afraid that Beebe would try to fire her, Strickland assured her that the termination of

her employment could only occur with the approval of two vice presidents.  Strickland told

plaintiff to sign the Notice of Unacceptable Behavior.  When plaintiff asked what the company

would do about Beebe's behavior toward her, Strickland said that plaintiff would never know if

or what actions would be taken against Beebe.

On June 25, 2010, plaintiff emailed Beebe and her colleagues saying that she would be

working from home that day and would be out of the office the following Monday through

Wednesday as well.  Beebe responded by saying that plaintiff could not be off work Monday

through Wednesday since "this time off was not scheduled" in advance.  Plaintiff replied that she

would work from home those days because Beckwith would be on vacation Monday and

Tuesday, and plaintiff did not anticipate that she would send her any work.  Beebe, in turn,

responded by stating that "unscheduled days working at home are on a case-by-case basis (for

various reasons) and they are normally approved by me ahead of time."  Beebe eventually

approved the schedule changes in plaintiff's timesheet without comment.

On July 14, 2010, plaintiff held a meeting with Beckwith.  After plaintiff had left to

attend the meeting, Beebe emailed her, saying she wanted plaintiff's back-ups to participate at

the client's office.  Plaintiff did not see the email until after the meeting.

On July 20, 2010, Strickland met with plaintiff so that plaintiff could provide her with supporting information for plaintiff's harassment charge.  Plaintiff explained the events that occurred since October 12, 2009.  She expressed the fear that Beebe's "back-up plan was really a 'replacement plan,'" and that Beebe was trying to build a case for firing plaintiff.  Plaintiff told Strickland that Beebe showed favoritism toward younger employees, singled her out with respect to creating "back-up plans" and copying others on emails, was vindictive toward her, yelled and made threats to her, attempted to control employees through intimidation, made repeated false statements about her and her work, and made up new rules to support her harassment.  She attributed all of this to Beebe being biased against her because of her age.  Strickland requested documentation from plaintiff and following the meeting plaintiff sent Strickland a number of emails which supported her allegations against Beebe.

A few hours after plaintiff's meeting with Strickland, Beebe sent plaintiff a memo in which she alleged that plaintiff was insubordinate in failing to get approval for leave on July 9, 2010 and failing to having her back-up attend the Glossary meeting on July 14.  Plaintiff responded that she had obtained Beebe's approval for her schedule on July 9 and that she did not see Beebe's email until after she had returned from the meeting with Beckwith.  Plaintiff forwarded Beebe's email to Strickland with the comment, "As you can see from Debbie's email to me yesterday afternoon, she is continuing her harassment of me."

On July 26, 2010, Perry advised plaintiff that her employment was terminated.  At the time her employment was terminated, plaintiff was 67 years old.  She was replaced by two persons, one who was in her 30s, and one of whom was 40.

II.

Prudence might dictate that I wait until discovery has been conducted and defendant has filed a motion for summary judgment before I rule upon the question of the viability of plaintiff's claims.  I am totally satisfied, however, that the facts as alleged by plaintiff demonstrate that her claims are not viable, and that deferring ruling would simply increase the cost of litigation unnecessarily.

As a starting point, it is to be noted that Beebe was the person who initially hired plaintiff when plaintiff was in her sixties.  *See Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991) ("When the hirer and firer are the same individual, there is a powerful inference relating to the 'ultimate question' that discrimination did not motivate the employer.").  Moreover, Beebe supported plaintiff's request for a salary increase when ICF took over the CIAT contract from LM.  Indeed, the record establishes that if anyone was fixated upon the concept of age, it was plaintiff herself who, when she was hired by ICF, made it clear that she did not want to report to younger employees.

The facts alleged by plaintiff do establish that her relationship with Beebe deteriorated, beginning with so-called computer "glitch" that occurred on October 9, 2009.  However, although plaintiff conclusorily avers that the deterioration in the relationship was due to Beebe being biased against her because of her age, she alleges no facts to support that averment.  That, of course, lies at the essence of an ADEA claim.  The mere fact that Beebe became dissatisfied with her performance does not *ipso facto* establish that she was the subject of ADEA discrimination.  Plaintiff apparently believed that because Beebe mentored other younger employees manifests that she was "playing favorites" with younger employees.  In fact, all that Beebe's mentoring of younger employees shows is that Beebe was a good supervisor who was

13

committed to furthering the careers of all persons working for her whose performance so warranted.

It may be that plaintiff was not responsible for the October 12, 2009 computer "glitch." It may also be that thereafter Beebe treated plaintiff with hostility and disrespect.  However, plaintiff's disagreement with Beebe's evaluation of her performance or suspicion that Beebe treated her as she did because of a bias based upon plaintiff's age does not establish age discrimination.  *See Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) (finding plaintiff's unsupported speculation in form of unsubstantiated allegations and bald assertions concerning her own qualifications and shortcomings of her co-workers insufficient to show discrimination).  At the most, it would establish that Beebe was not a good supervisor and that ICF erred in concluding that plaintiff, not Beebe, was the source of plaintiff's perceived unsatisfactory performance.[2]

It is correct that at some point plaintiff began to complain that she was discriminated against because of her age.  However, there was not any good faith basis for such a complaint. To permit an employee to place herself in protected status, making an allegation of discrimination that has no basis would be to deprive an employer of appropriate control over the workplace and disrupt working relationships.  Therefore, plaintiff's retaliation claim fails as a matter of law as well.

---

[2] I certainly am not suggesting that Beebe is not, in fact, a good supervisor or that defendant erred in siding with her.  Plaintiff's allegations themselves might reflect that it was plaintiff who kept escalating the unfortunate situation that had been developed.  My decision is not, however, based upon that inference.  As stated above, I have accepted plaintiff's allegations as true.

A separate order granting defendants' motion to dismiss is being entered herewith.

Date:  December 21, 2012           ____/s/_____
                                  J. Frederick Motz
                                  United States District Judge